

FILED by _____ KS _____ D.C.

Apr 14, 2022

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## 22-20152-CR-MOORE/LOUIS
Case No. _____

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 1035(a)(2)
18 U.S.C. § 2
18 U.S.C. § 982(a)(7)

**UNITED STATES OF AMERICA**

**v.**

**ELIZABETH HERNANDEZ,**

**Defendant.**

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### The Medicare Program

1.      The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled.  The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.      Medicare was subdivided into multiple program "parts."  Medicare Part A covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies.  Medicare Part B covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, durable medical equipment ("DME") and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.  Medicare Part C, also known as the "Medicare Advantage" Program, provided Medicare beneficiaries with the option to receive their Medicare benefits through private managed health care plans, including health maintenance organizations and preferred provider organizations.  Health care providers, whether under Medicare Part A, B, or C, that provided and supplied items and services to Medicare beneficiaries were referred to as "providers."

3.      Medicare and Medicare Advantage were "health care benefit program[s]," as defined by Title 18, United States Code, Section 24(b).

### Part B Coverage and Regulations

4.      CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

5.      To receive Medicare reimbursement, providers had to make appropriate application to the MAC and execute a written provider agreement.  The Medicare provider enrollment application, CMS Form 855, was required to be signed by an authorized representative of the provider.  CMS Form 855 contained a certification that stated:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [the provider]. The Medicare laws, regulations, and program instructions are available through the [MAC]. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback Statute…).

6.      CMS Form 855 contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

7.      Payments under Medicare Part B were often made directly to the provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the provider. Once such an assignment took place, the provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

8.      A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN") or Medicare Beneficiary Identifier ("MBI"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

### Part C – Medicare Advantage

9.      Medicare Advantage plans provided beneficiaries with all of the same services provided by an original fee-for-service Medicare plan, in addition to mandatory supplemental benefits and optional supplemental benefits.

10.     To receive Medicare Advantage benefits, a beneficiary was required to enroll in a managed care plan operated by a private company approved by Medicare.  Those companies were often referred to as Medicare Advantage plan "sponsors."  A beneficiary's enrollment in a Medicare Advantage plan was voluntary.

11.     Rather than reimbursing based on the extent of the services provided, as CMS did for providers enrolled in original fee-for-service Medicare, CMS made fixed, monthly payments to a plan sponsor for each beneficiary enrolled in one of the sponsor's plans, regardless of the services rendered to the beneficiary that month or the cost of covering the beneficiary's health benefits that month.  To receive payment, providers submitted or caused the submission of claims to the plan sponsor electronically via interstate wires, either directly or through a billing company. The plan sponsor then reimbursed the provider based on the services that were purportedly provided.

12.     A number of sponsors were contracted by CMS to provide managed care to Medicare beneficiaries through various approved plans.  Such plans covered DME and related health care benefits, items, and services.  Among their responsibilities, these sponsors received, adjudicated, and paid the claims of authorized providers seeking reimbursements for the cost of DME and related health care benefits, items, or services supplied to beneficiaries.

**Genetic Testing**

13.     Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future, including certain types of cancers (known as cancer genetic or "CGx" testing), cardiovascular disease, diabetes, obesity, Parkinson's disease, Alzheimer's disease, and dementia. Pharmacogenetic tests ("PGx" tests) were laboratory tests that used DNA sequencing to assess

how the body's genetic makeup would affect the response to certain medications.

14.     Except for certain statutory exceptions, Medicare did not cover laboratory testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."  42 U.S.C. § 1395y(a)(1)(A).

15.     If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem" and "[t]ests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

16.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer.  Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

**Durable Medical Equipment**

17.     Medicare covered an individual's access to DME, such as off-the-shelf ("OTS") ankle braces, knee braces, back braces, elbow braces, wrist braces, and hand braces (collectively, "braces").  OTS braces require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit the individual.

18.     A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a

licensed physician or other qualified health care provider.

19.     For certain DME products, Medicare promulgated additional requirements that a DME order must meet for an order to be considered "reasonable and necessary."  For example, for OTS knee braces billed to Medicare under the Healthcare Common Procedures Coding System ("HCPCS") Codes L1833 and L1851, an order is deemed "not reasonable and necessary" and is not eligible for reimbursement unless the ordering physician documents the beneficiary's knee instability using an objective description of joint laxity determined through a physical examination of the beneficiary.

### Telemedicine

20.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or a telephone, to interact with a patient. Telemedicine companies provided telemedicine services, or telehealth services, to individuals by hiring doctors and other health care providers.

21.     Medicare covered expenses for specific telehealth services if certain requirements were met.  These requirements included that: (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was in a practitioner's office or a specified medical facility—not at a beneficiary's home—during the telehealth service with a remote practitioner.  In or around March 2020, in response to the COVID-19 pandemic and in order to enable access to care during the public health emergency, some of these requirements were amended temporarily to, among other things, cover telehealth services for certain office and hospital visits, even if the beneficiary was not located in a rural area or a health professional shortage area and even if the telehealth services were furnished to beneficiaries in their home.

## The Defendant and Related Entities and Individuals

22.      Defendant **ELIZABETH HERNANDEZ**, a resident of Miami-Dade County, was an Advanced Registered Nurse Practitioner licensed in at least 28 states, including Florida, and an enrolled provider of medical services to Medicare beneficiaries.

23.      Panda Conservation Group, LLC ("Panda") was a company organized under the laws of Texas, with a mailing address in Deerfield Beach, Florida.  Panda owned multiple laboratories engaging in CGx and Cardio genetic testing, including Amerihealth Laboratory, LLC ("Amerihealth") and MP3 Labs, Inc. ("MP3") (collectively, "Panda Labs"), which were located in Texas.

24.      Michael Stein, a resident of Palm Beach County, through his companies 1523 Holdings LLC ("1523 Holdings"), d/b/a Inwerx, and Growthlogix, LLC ("Growthlogix"), d/b/a Digital Mayo, LLC, arranged for telemedicine providers to refer Medicare beneficiaries to the Panda Labs for genetic testing.

25.      Dial4MD, Inc ("Dial4MD") was a purported telemedicine company organized under the laws of Florida and doing business in Margate, Florida.

26.      Nationwide Call Center Inc and Sunrise Medical Inc (collectively, "Sunrise Entities") were purported telemedicine companies organized under the laws of Florida and doing business in Pompano Beach, Florida.  Steven Kahn controlled and operated the Sunrise Entities.

27.      Comprehensive TelCare, LLC ("CompTel") was a purported telemedicine company located in Tampa, Florida.

28.      Allure Health Management LLC ("Allure") was a purported telemedicine company organized under the laws of Wyoming with its principal place of business in Tampa, Florida.

Allure was formed when CompTel was dissolved and was operated by the same owners as CompTel.

29.     Company A was a purported marketing company organized under the laws of Florida and doing business in Palm Beach County, Florida.

30.     Company B was a purported marketing company organized under the laws of Maryland and doing business in Worcester County, Maryland.

31.     Marketer 1 was an individual who connected call centers with purported marketing companies and located potential beneficiaries for genetic testing and other products.

32.     Individual 1, a resident of Miami-Dade County, was a nurse practitioner who worked with **ELIZABETH HERNANDEZ**.

**COUNT 1**
**Conspiracy to Commit Health Care Fraud and Wire Fraud**
**(18 U.S.C. § 1349)**

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around August 2018, and continuing through in or around June 2021, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ELIZABETH HERNANDEZ,**

did knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with Michael Stein, Marketer 1, and other persons known and unknown to the Grand Jury, to commit offenses against the United States, that is:

a.     to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage, and to obtain, by means of materially false and

fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343.

## Purpose of the Conspiracy

3.      It was a purpose of the conspiracy for **ELIZABETH HERNANDEZ** and her co-conspirators to unlawfully enrich themselves by, among other things: (a) soliciting and receiving kickbacks and bribes in exchange for signing doctors' orders for DME and genetic testing that was medically unnecessary and not legitimately prescribed; (b) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare and Medicare Advantage for medically unnecessary DME and genetic tests; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare for telemedicine consultations that were not medically necessary, not eligible for reimbursement, and not rendered as represented to Medicare; (d) concealing and causing the concealment of false and fraudulent claims; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## Manner and Means of the Conspiracy

The manner and means by which defendant **ELIZABETH HERNANDEZ** and her co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4.      **ELIZABETH HERNANDEZ** falsely certified to Medicare that she would comply with all Medicare rules and regulations and federal laws, including the Federal Anti-Kickback Statute, the requirement not to knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare, and the requirement not to submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

5.      **ELIZABETH HERNANDEZ** worked with Individual 1, CompTel, Allure, Dial4MD, the Sunrise Entities, Panda, Company A, Company B, and other purported telemedicine and marketing companies to sign doctors' orders for DME and genetic testing that were used to submit false and fraudulent claims to Medicare.

6.      **ELIZABETH HERNANDEZ** electronically signed and caused the electronic signing of doctors' orders for DME for CompTel, Allure, Dial4MD, the Sunrise Entities, and other purported telemedicine companies (a) regardless of medical necessity, (b) in the absence of a pre-existing practitioner-beneficiary relationship, (c) without physically examining the beneficiary, and (d) based solely on a brief telephonic conversation with the beneficiary or, frequently, without any conversation with the beneficiary.

7.      **ELIZABETH HERNANDEZ** was not treating and did not examine the beneficiaries for whom she signed doctors' orders for DME.  Despite this, **ELIZABETH HERNANDEZ** often signed certifications on doctors' orders stating that she personally performed

an assessment of the beneficiary and verified that the DME she prescribed was medically necessary.

8.    **ELIZABETH HERNANDEZ** accepted kickbacks and bribes from the purported telemedicine companies in exchange for signing the doctors' orders for DME.

9.    **ELIZABETH HERNANDEZ** and her co-conspirators submitted and caused the submission of false and fraudulent claims to Medicare and Medicare Advantage in the approximate amount of $14 million for DME that was (a) not medically necessary, (b) not eligible for Medicare reimbursement, and (c) ordered in exchange for kickbacks and bribes.

10.   **ELIZABETH HERNANDEZ** also agreed to order genetic tests for Panda, Company A, Company B, and other purported marketing and telemedicine companies that were (a) not medically necessary, (b) not eligible for Medicare reimbursement, and (c) ordered in the absence of a pre-existing practitioner-beneficiary relationship, without using the test results in the treatment of the beneficiaries, and without a proper telemedicine visit.

11.   **ELIZABETH HERNANDEZ** falsely certified in many of the genetic testing orders that she was the beneficiary's treating physician and that the genetic test was ordered for the diagnosis and treatment of the beneficiary's individual medical condition, as required by Medicare, and not for screening.

12.   **ELIZABETH HERNANDEZ**, in exchange for signing the genetic testing orders, received kickbacks and bribes in the form of sham consultation fees, beneficiary referrals, and the opportunity to bill Medicare for telemedicine visits under the more flexible telehealth rules CMS put in place during the COVID-19 pandemic.

13.   **ELIZABETH HERNANDEZ** and her co-conspirators submitted and caused the submission of false and fraudulent claims to Medicare and Medicare Advantage in the approximate

amount of $119 million for genetic tests that were (a) not medically necessary, (b) not eligible for reimbursement, (c) not prescribed as the result of a legitimate telemedicine visit or practitioner-beneficiary relationship, and (d) induced through kickbacks, bribes, and other illicit incentives.

14.     **ELIZABETH HERNANDEZ** submitted and caused the submission of false and fraudulent claims to Medicare in the approximate amount of $1.3 million for telemedicine consultations that were (a) not actually performed, (b) not eligible for reimbursement, and (c) not rendered as represented to Medicare.

All in violation of Title 18, United States Code, Section 1349.

**COUNTS 2-7**
**Health Care Fraud**
**(18 U.S.C. § 1347)**

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around August 2018, and continuing through in or around June 2021, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ELIZABETH HERNANDEZ,**

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit programs.

## Purpose of the Scheme and Artifice

3.      It was a purpose of the scheme and artifice for **ELIZABETH HERNANDEZ** and her accomplices to unlawfully enrich themselves by, among other things: (a) soliciting and receiving kickbacks and bribes in exchange for signing doctors' orders for DME and genetic testing that was medically unnecessary and not legitimately prescribed; (b) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare and Medicare Advantage for medically unnecessary DME and genetic tests; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare for telemedicine consultations that were not medically necessary, not eligible for reimbursement, and not rendered as represented to Medicare; (d) concealing and causing the concealment of false and fraudulent claims; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

## The Scheme and Artifice

4.      The Manner and Means of the Conspiracy section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## Acts in Execution or Attempted Execution of the Scheme and Artifice

5.      On or about the dates set forth as to each count below, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant, **ELIZABETH HERNANDEZ**, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program in that the defendant submitted and caused the submission of false and fraudulent claims to Medicare and Medicare Advantage, seeking the identified dollar

amounts, and representing that such benefits, items, and services were medically necessary, eligible for Medicare reimbursement, and provided to beneficiaries as claimed:

| Count | Beneficiary | Approx. Submission Date | Billing Entity & Medicare Claim No. | Approx. Total Amount Billed | Description for Highest Billed Genetic Testing Procedure or Telemedicine Visit |
|---|---|---|---|---|---|
| 2 | J.W. | 8/7/2020 | **ELIZABETH HERNANDEZ** 590220220717500 | $200.00 | New patient outpatient visit, total time 45-59 minutes (CPT Code 99204-95) |
| 3 | P.K. | 9/15/2020 | **ELIZABETH HERNANDEZ** 591020259029280 | $200.00 | New patient outpatient visit, total time 45-59 minutes (CPT Code 99204-95) |
| 4 | P.K. | 9/16/2020 | AMERIHEALTH 452920260590780 | $9,931.69 | Molecular pathology procedure level 9 |
| 5 | J.W. | 10/9/2020 | AMERIHEALTH 452920283551920 | $9,931.69 | Molecular pathology procedure level 9 |
| 6 | M.N. | 10/15/2020 | **ELIZABETH HERNANDEZ** 590220289811670 | $200.00 | New patient outpatient visit, total time 45-59 minutes (CPT Code 99204-95) |
| 7 | M.N. | 10/27/2020 | AMERIHEALTH 452920301568490 | $13,600.62 | Molecular pathology procedure level 9 |

In violation of Title 18, United States Code, Sections 1347 and 2.

14

## Counts 8-10
### False Statements Relating to Health Care Matters
### (18 U.S.C. § 1035)

1.      The General Allegations section of this Indictment is re-alleged and incorporated

by reference as though fully set forth herein.

2.      On or about the dates specified in each count below, in Miami-Dade County, in the

Southern District of Florida, and elsewhere, the defendant,

### ELIZABETH HERNANDEZ,

in a matter involving a health care benefit program, specifically Medicare and Medicare

Advantage, did knowingly and willfully make and use materially false writings and documents,

knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in

connection with the delivery of and payment for health care benefits, items, and services, as

described below:

| Count | Approximate Date | Medicare Beneficiary | Document Containing False Statements |
|-------|------------------|----------------------|--------------------------------------|
| 8 | 3/27/2019 | D.D. | Doctor's order for braces certifying that **ELIZABETH HERNANDEZ** personally performed an assessment of D.D. and had a valid practitioner-patient relationship with D.D. |
| 9 | 6/23/2020 | R.C. | Doctor's order for genetic testing certifying that **ELIZABETH HERNANDEZ** was R.C.'s treating physician and ordered the genetic testing for the diagnosis and treatment of R.C.'s individual medical condition and not for screening purposes |
| 10 | 7/23/2020 | A.R. | Doctor's order for genetic testing certifying that **ELIZABETH HERNANDEZ** was A.R.'s treating physician and ordered the genetic testing for the diagnosis and treatment of A.R.'s individual medical condition and not for screening purposes |

In violation of Title 18, United States Code, Sections 1035(a)(2) and 2.

15

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(7))

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for alleging forfeiture to the United States of certain property in which the defendant, **ELIZABETH HERNANDEZ**, has an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Sections 1035, 1347, or 1349, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

        a.   cannot be located upon the exercise of due diligence;

        b.   has been transferred or sold to, or deposited with, a third party;

        c.   has been placed beyond the jurisdiction of the court;

        d.   has been substantially diminished in value; or

        e.   has been commingled with other property which cannot be divided without difficulty;

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as made applicable by Title 18, United States Code, Section 982(b).

A TRUE BILL

_____
FOREPERSON

_____
JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF FLORIDA

JOSEPH S. BEEMSTERBOER
ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

_____
ANDREA SAVDIE
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| UNITED STATES OF AMERICA | CASE NO.: |
|---|---|

v.

ELIZABETH HERNANDEZ,

_____/
Defendant.

**CERTIFICATE OF TRIAL ATTORNEY\***

**Court Division** (select one)

☑ Miami   ☐ Key West   ☐ FTP
☐ FTL     ☐ WPB

**Superseding Case Information:**

New Defendant(s) (Yes or No)
Number of New Defendants
Total number of New Counts

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect:

4. This case will take  10  days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                    (Check only one)
   I    ☐ 0 to  5 days        ☐ Petty
   II   ☑ 6 to 10 days        ☐ Minor
   III  ☐ 11 to 20 days       ☐ Misdemeanor
   IV   ☐ 21 to 60 days       ☑ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge                    Case No.
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No.
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
   If yes, Judge Altonaga          Case No.  21-CR-20321
9. Defendant(s) in federal custody as of
10. Defendant(s) in state custody as of
11. Rule 20 from the            District of
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No

By:   _____

Andrea Savdie
DOJ Trial Attorney
Court ID No.   A5502799

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### PENALTY SHEET

**Defendant's Name:**  **ELIZABETH HERNANDEZ**

**Case No:**

Count #:   1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud and Wire Fraud

**\*Max Penalty**:  Twenty (20) years' imprisonment

Counts #:   2 – 7

Title 18, United States Code, Section 1347

Health Care Fraud

**\*Max Penalty**:  Ten (10) years' imprisonment as to each count

Counts #:   8 – 10

Title 18, United States Code, Section 1035

False Statements Relating to Health Care Matters

\*Max Penalty:  Five (5) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**