**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:22-CR-20152-MOORE**

**UNITED STATES OF AMERICA**

**vs.**

**ELIZABETH HERNANDEZ,**

**Defendant**
______________________________________/

**UNITED STATES' OMNIBUS RESPONSE TO DEFENDANT'S MOTIONS *IN LIMINE***

The United States of America, by and through its undersigned counsel, respectfully files this response to the Defendant's Omnibus Motions *in Limine* [D.E. 99].

**A. Response to Defense Motion *in Limine* #1: Lay witnesses may testify regarding beneficiaries' need for durable medical equipment or genetic testing to the extent the testimony is consistent with Federal Rule of Evidence 701.**

As the Defense acknowledges, Federal Rule of Evidence 701 permits lay witnesses to testify to opinions or inferences that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. To the extent the Government's lay witnesses personally observed or had knowledge of facts that bear on the medical necessity of the DME and genetic testing the Defendant was prescribing, it is permissible for the witnesses to testify regarding those facts and the inferences they drew from them. For instance, the Medicare beneficiaries who will testify at the trial are permitted to testify about their own observations of their physical condition, which bears directly on the question of whether they needed the DME or genetic testing prescribed for them by the Defendant. That testimony would be based on their perception of their own health,

goes to an issue at the heart of this case (whether the Defendant was prescribing items for Medicare beneficiaries without regard to medical necessity in order to get paid), and is not based on scientific, technical, or other specialized knowledge.

The probative value of such testimony is not substantially outweighed by unfair prejudice such that it would be excludable under Federal Rule of Evidence 403. As stated above, the crux of this case is that the Defendant was robo-signing doctor's orders for DME and genetic testing for Medicare beneficiaries she never saw, spoke to, or otherwise treated—*i.e.*, for whom she never assessed medical necessity—in exchange for kickbacks and bribes. She was also falsely certifying the medical necessity of the DME and genetic testing in the doctor's orders or directing others to do so on her behalf, which are false statements that are expressly alleged in the Indictment. Testimony regarding the medical necessity of the items the Defendant prescribed is therefore central to the allegations in the Indictment and certainly not outweighed by unfair prejudice. And there is no question that it is admissible from lay witnesses (particularly Medicare beneficiaries who are testifying regarding their own need for tests or treatments) to the extent it does not run afoul of Federal Rule of Evidence 701.

**B. <u>Response to Defense Motion *in Limine* #2</u>: Neither party can elicit testimony from witnesses regarding legal conclusions.**

Although it is sometimes hard to draw these lines without hearing the question and answer in context,[1] the Government agrees that no witness *for either party* can testify to legal conclusions

[1] Of course, the Government must prove that the Defendant understood the wrongfulness of her conduct, and therefore must be permitted to elicit admissible, first-hand observations from witnesses about what the Defendant did, said, or her demeanor. And, if the Defendant told someone she understood certain conduct was wrongful (or something to that effect), her own statements would be admissible as a statement by a party-opponent. From this first-hand testimony, the Government will argue—as it must to meet the elements of the offense—that the Defendant acted willfully. The Government does not understand that the Defense is attempting to exclude this category of evidence. Rather, the Government understands that the Defense seeks to

in this trial. However, this does not preclude the Government's cooperating witnesses from explaining the crimes to which they pled guilty and testifying as to their own state of mind at the time they engaged in the conduct. Such testimony does not call for a legal conclusions or opinions on ultimate issues in this case, but rather is a factual explanation of the conduct that led the cooperating witnesses to plead guilty to a crime. *See, e.g., United States v. Poulin*, 461 F. App'x 272, 282-83 (4th Cir. 2012) (upholding witness testimony regarding legality of conduct because the district court allowed the testimony only to the extent it helped jurors understand why actors did or said certain things).

**C. Response to Defense Motion *in Limine* #3, Part I: Evidence regarding telemarketers for whom the Defendant signed genetic testing and durable medical equipment orders is admissible as *direct evidence of* and *intrinsic to* the charged conspiracy.**

In her third motion *in limine*, the Defendant seeks to exclude evidence relating to purported marketing and telemedicine entities (collectively, "telemarketers") that are not specifically enumerated among the examples set forth in the Indictment. This motion should be denied because all DME and genetic testing telemarketers are encompassed by the Indictment's conspiracy allegations. As set forth more fully below, the Indictment alleges that the Defendant fraudulently signed orders for two discrete services: DME and genetic testing. Although the Defendant sold her signature ordering a startling array of other items,[2] the Government intends to prove the fraudulent nature of only DME and genetic testing.[3]

---

exclude opinion or speculative testimony by witnesses regarding whether the Defendant's conduct was illegal. The Government agrees that neither party can elicit such testimony to prove or rebut any element of the charged offenses.

[2] These include skin products, erectile dysfunction drugs, birth control, foot baths, and others.

[3] As set forth more fully below, passing references to these other products were part of the Defendant's correspondence at this time, and will come up in the evidence as context, but the Government does not intend to prove they are "other bad acts."

However, the Defendant seeks to limit the Government to only evidence of the *specific examples* of companies identified in the Indictment, ignoring the Indictment's language that "other" telemarketing companies are included in the charges. *See* Indictment [D.E. 3] at 10 and 11. There is no legal basis for such a limitation. Rule 404(b) is irrelevant with respect to this evidence, and it cannot be excluded under Rule 403 because, although it is prejudicial to the Defendant (as all the Government's evidence is), it is not unfairly prejudicial, confusing, misleading, or cumulative. To the contrary, as set forth below: (a) evidence related to DME and genetic testing fraud is admissible as direct evidence of the conspiracy charged; and (b) passing references to the other types of prescriptions are integral parts of the trial evidence, and are admissible to put the charged conduct in context.

***i. Evidence relating to telemarketers for whom the Defendant signed genetic testing and DME orders are direct evidence of the charged conduct.***

During the period of the conspiracy charged in the Indictment, the Defendant was the most prolific prescriber of fraudulent genetic testing in the country, and among the most prolific prescribers of fraudulent durable medical equipment. The Defendant, and a coconspirator nurse who worked under her and at her direction (Individual 1 in the Indictment), essentially robo-signed genetic testing and durable medical equipment orders routed to them from many different telemarketers, who would then sell such orders to DME suppliers and laboratories that would bill Medicare for the DME and genetic tests. Medicare was fraudulently billed hundreds of millions of dollars as a result of the genetic testing and DME orders that the Defendant signed or allowed others to sign on her behalf.

The Government is not required to file a 404(b) notice for evidence that is directly probative of the charged conspiracy, nor is such evidence excludable under Fed. R. Evid. 403. *See United States v. Watson*, 696 F. App'x 385, 388–89 (11th Cir. 2017) (finding that admission of

uncharged tax returns did not run afoul of Rule 403 because the uncharged tax returns were direct evidence of the conspiracy charge in the Indictment and "direct evidence of guilt may not be excluded under Rule 403.").

The Indictment names *as examples* some of the telemarketers that were routing genetic testing and durable medical equipment orders to the Defendant for her to rubberstamp, but it also expressly and repeatedly alleges that the Defendant signed such orders for "***other purported telemedicine and marketing companies***." *See* Indictment [D.E. 3] at 10 and 11 (emphasis added). In other words, regardless of whether they were cited as examples at the time of Indictment, evidence of telemarketers for which the Defendant signed (or directed Individual 1 to sign) DME and genetic testing orders is admissible as direct evidence of the charged conspiracy, and this includes several of the entities the Defendant listed in her motion (*e.g.*, RCE, Eloquent Health, Vibrant Health).[4]

Indeed, the Defendant herself did not often distinguish between these entities in her own communications and records. Text messages between the Defendant and Individual 1 show that the Defendant and Individual 1 would log into their computers from home late into the night and sign as many orders as they could, regardless of which company was sending the orders to them, and they communicated regarding these various companies together in the same text message exchanges. To illustrate: one online platform, called DMERx, was used by various telemarketing companies to send orders to the Defendant for her signature. Rather than distinguish between the companies, Defendant and Individual 1 simply texted about who would sign or handle the DMERx

[4] The Government notes that two of the entities the Defense listed in their motion, Ocean Power Media and Comprehensive Telcare, are in fact specifically referenced in the Indictment; Ocean Power Media is anonymized as Company A and Comprehensive Telcare is named on pp. 7, 8, and 10 of the Indictment. And SOA was an offshoot of Sunrise Medical, which is referenced in the Indictment too.

orders. In another example, a spreadsheet recovered from the Defendant's computer tracks her patients for various telemarketers within the same spreadsheet (often naming two telemarketers in the same entry) because some of those signed orders were ultimately being sent to the same labs.

The Defense refers to these telemarketers as "clinics," which creates a false impression that they were somehow various separate places of employment where the Defendant worked.  These were not clinics.  They were telemarketers that basically acted as patient recruiters—they used call centers to convince Medicare beneficiaries to accept genetic testing and DME, and then sent orders to people like the Defendant who were willing to sign them.  A central theme of the Government's case is precisely this: even the Defendant did not distinguish which telemarketer was routing the orders to her; as long as she was paid, she was willing to sign.

The Government is not required to name every coconspirator in the Indictment (*see, e.g., United States v. Gospidon*, 224 F. App'x 940 (11th Cir. 2007)), and thus named, as examples, *some* of the telemarketers for which the Defendant and Individual 1 signed orders, stating explicitly that there were others as well.  This does not prevent the Government from presenting evidence at trial concerning other coconspirators or transactions that were part of the charged conspiracy, but that were not expressly listed as examples in the Indictment.  *See, e.g., United States v. Dugue*, 763 F. App'x 93, 94–95 (2d Cir. 2019) (finding that evidence of staged accidents not specifically detailed in the Indictment was admissible to prove conspiracy count where the Indictment described three staged accidents and expressly stated that there were others).

Neither can the Defense claim surprise or a lack of notice as to the DME and genetic testing companies that would be included in the Government's trial presentation.  In August of 2022, the Government presented much of its key evidence to the Defense—including evidence regarding the DME and genetic testing telemarketers—in a reverse proffer in which both defense counsel and

the Defendant were present. In addition, since January 2023, the Defense has been in possession of the Governments exhibits, exhibit list, and witness list—many of which relate, at least in part, to the other DME and genetic testing telemarketers.

Even if this evidence were not direct evidence of the charged conspiracy, which it plainly is, it would be admissible as intrinsic evidence because it "arose out of the same transactions or series of transactions as the charged offense," is "necessary to complete the story of the crime," and is "inextricably intertwined with the evidence regarding the charged offenses." *See United States v. Troya,* 733 F.3d 1125, 1131 (11th Cir. 2013). The Defendant was communicating with coconspirators about the various telemarketers for which she signed orders in the same text messages, emails, and conversations.  Indeed, the Defendant and Individual 1 tracked the orders they signed for the various telemarketers in the same text messages.  Individual 1 is expected to testify that she was directed by the Defendant to sign genetic testing and DME orders in DMERx and in various online drop boxes, and that she did not necessarily distinguish based on which telemarketer was supplying the orders.  As another example of how intertwined this evidence is, the Defendant signed genetic testing orders for the same laboratories through RCE (not named as an example in the Indictment) and Ocean Power Media (anonymized in the Indictment as Company A).  The orders for those laboratories look the same regardless of which telemarketer paid the Defendant to sign them, and they were discussed and tracked in the same spreadsheets.

In short, whether analyzed as direct or intrinsic evidence, the facts of this case cannot be parsed in the way the Defendant is suggesting, nor is there any legal basis for doing so.  All evidence of the Defendants' signing DME and genetic testing orders is admissible as direct evidence.

[Continued]

***ii. Telemarketers for whom the Defendant signed other types of prescriptions is in passing, or in rebuttal.***

At the same time the Defendant was engaged in the massive genetic testing and DME conspiracy alleged in the Indictment, the Defendant was also prescribing other medical items through "telemedicine," including foot bath medications and erectile dysfunction drugs, and texting about them at the same time she was texting about DME and genetic testing. The government does not intend to prove these prescriptions were fraudulent (or "other bad acts" under Rule 404(b)). Instead, passing references to these companies in the text messages between coconspirators, for example, speak to the sheer quantity of prescriptions she was signing in a day, leaving her no time to examine the medical necessity of the DME or genetic testing she was prescribing as alleged in the Indictment. For example, she is charged with billing Medicare for "impossible hours" – well over 24 hours in a day – for just genetic testing consults. The fact that she was *also* "working" for dozens of telemarketing companies at the same time was possible *because* of the fraud.

The Defendant's willingness to prescribe nearly any product to any person is all part of the same story, and although the Government's case-in-chief will be focused on the charged offenses—*i.e.*, the DME and genetic testing conspiracy and the related substantive counts—due to the integrated way in which the Defendant herself talked about these companies, references to the entities for which the Defendant was prescribing other items are inevitably going to come up in the trial evidence. In addition, they may be raised in rebuttal if the Defendant attempts to accuse the government of "cherry picking" or otherwise limit the kind and quantity of "work" she was doing in a day.

**D. Response to Defense Motion *in Limine* #3, Part II: The Government does not intend to introduce evidence relating to the food stamp fraud investigation in its case-in-chief.**

The Defense next argues that the Government should be precluded from introducing evidence at trial regarding the Florida Department of Financial Services' investigation of the Defendant for food stamp fraud. The Government is not seeking to introduce evidence of that investigation but reserves the right to use it for cross-examination or impeachment should the Defendant testify or open the door. *United States v. Cruz*, No. 20-13223, 2022 WL 808008, at *4 (11th Cir. Mar. 17, 2022) (indicating that incidents used solely to impeach the defendant do not fall within the scope of Rule 404(b)).

**E. Response to Defense Motion *in Limine* #4: The Government intends to comply with hearsay rules and properly authenticate its exhibits.**

The Defendant next argues that the Government must comply with the rules governing hearsay and authenticity, a premise with which the Government agrees.

However, the specific examples in the Motion demonstrate that the Defendants' application of those rules is misguided. There are many ways to authenticate evidence, and the Defense is not permitted to choose its preference. The Government may authenticate evidence it in any way permissible under the law.

As an initial matter, the Defendant has had a full copy of the Government's proposed exhibits since January 2023, but she has not identified a single, specific document that she believes to be inadmissible hearsay or inauthentic. Instead, she vaguely states that that the Government may not introduce (for example) "documents…from Murdock Consulting" without bringing in a current or former affiliate of that company to testify.[5]

[5] Should the Defense wish to question these witnesses (*i.e.*, Alicia Hiller or "someone from Murdock consulting"), they are equally available to the defendant by subpoena.

But there are many ways to authenticate a document. For example, if such documents were obtained from a search warrant, the Government may authenticate those documents through an agent who testifies about how they were obtained.   Likewise, documents for which the Government has a valid declaration pursuant to Federal Rule of Evidence 902(11) ("certified domestic records of a regularly conducted activity") may self-authenticate by way of a certification.   Finally, the Defense has stipulated to the authenticity of a number of other documents, precisely for the purpose of judicial economy.  In other words, it is a frequent practice to stipulate (or to permit through Rule 902(11)) the authenticity of business records to avoid taking the jury's time with administrative witnesses who will be flown from all over the country to Miami to testify, simply, "yes, those are the records from my company."

Although the Defendant has not specified which exhibits are at issue in this motion, to the extent the documents are emails between the Defendant and another person about the scheme, these  emails and text messages constitute statements of the Defendant and/or will be introduced for their effect on the listener and therefore do not constitute hearsay.

In short, as a general matter, the Government intends to properly authenticate every exhibit on the exhibit list (unless authenticity is stipulated) and understands the hearsay rules. As to individual decisions on specific exhibits, the Government respectfully submits that those issues may be best resolved after the Government has had the opportunity to lay foundation and move for their admission at trial.

(Continued on next page.)

Dated: May 15, 2023

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

By:     */s/ Katherine Payerle*
Andrea Savdie, Trial Attorney
Florida Special Bar No. A5502799
U.S. Department of Justice
Criminal Division, Fraud Section
12020 Miramar Parkway
Miramar, Florida 33025
Phone: (202) 262-6453
Email: Andrea.Savdie@usdoj.gov

Katherine Payerle
Assistant Chief
Florida Special Bar No. A5502190
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 341-4227
Email: Katherine.Payerle@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Andrea Savdie, hereby certify that on May 15, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By: */s/ Katherine Payerle*

Andrea Savdie, Trial Attorney
Florida Special Bar No. A5502799
U.S. Department of Justice
Criminal Division, Fraud Section
12020 Miramar Parkway
Miramar, Florida 33025
Phone: (202) 262-6453
Email: Andrea.Savdie@usdoj.gov